1
2
3
4
5
6
7
8       **UNITED STATES DISTRICT COURT**
9       **CENTRAL DISTRICT OF CALIFORNIA**
10
11  MILDRED F. TORRES,                )        Case No. EDCV 06-00072-JWJ
12              Plaintiff,            )        ORDER REMANDING ACTION
                                      )        FOR FURTHER PROCEEDINGS
13      vs.                           )
                                      )
14  MICHAEL J. ASTRUE,[1]             )
    Commissioner of the Social        )
15  Security Administration,          )
                                      )
16              Defendant.            )
17  _____  )
18
19          Plaintiff seeks review of the decision of defendant Commissioner of

20  the Social Security Administration, denying plaintiff's application for a

21  period of disability and Disability Insurance Benefits under Title II of the

22  Social Security Act.  As discussed below, this Court vacates the decision of

23  the Administrative Law Judge and remands this action to the Commissioner

24  _____

25          [1]  Michael J. Astrue became the Commissioner of Social Security on
    February 12, 2007.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil
26  Procedure, Michael J. Astrue should be substituted in place of Commissioner
    Jo Anne B. Barnhart as defendant in this action. No further action need be
27  taken to continue this suit by reason of the last sentence of 42 U.S.C.
    § 405(g).
28

                                       1

for further proceedings.

## I.  SUMMARY OF DISTRICT COURT PROCEEDINGS

On January 20, 2006, plaintiff Mildred F. Torres filed a Complaint seeking review of the decision of the Commissioner of Social Security denying plaintiff's claim for Disability Insurance Benefits.  On February 6, 2006, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before United States Magistrate Judge Jeffrey W. Johnson, and to have the Magistrate Judge conduct any and all further proceedings in the instant action and order the entry of final judgment.  On June 1, 2006, defendant filed an "Answer to Complaint," along with a copy of the Certified Administrative Record (hereinafter "CAR") of the administrative proceedings in this matter.  On September 21, 2006, the parties filed a Joint Stipulation addressing their respective claims.

This matter is now deemed under submission and ready for decision.

## II.  FACTUAL BACKGROUND

**A.    Summary of Administrative Proceedings**

On May 21, 2001, plaintiff filed an application for Disability Insurance Benefits, alleging an onset of disability from September 28, 2000. (CAR 76-78.)   Her application was denied initially and on reconsideration. (CAR 30-33, 35-39.)  On February 12, 2002, plaintiff filed a request for a hearing before an Administrative Law Judge.  (CAR 40.)   On November 25, 2002, Administrative Law Judge F. Keith Varni (hereinafter "ALJ") conducted a hearing at which plaintiff appeared with counsel and testified. (CAR 495-509.)   On December 15, 2002, the ALJ issued a decision denying benefits.  (CAR 25-29.)   On December 23, 2002, plaintiff requested review of the ALJ's decision; the Appeals Council granted review on October 24,

1  2003, and subsequently vacated the decision and remanded the matter back

2  to the ALJ for a new decision.   (CAR 59-62.)   In accordance with the Order

3  of the Appeals Council, a second hearing was held on October 26, 2004.

4  Plaintiff again appeared and testified.  (CAR 513-21, 524, 530-31.)

5  Vocational expert Joseph Mooney (hereinafter "VE") also testified.  (CAR

6  521-30, 532-36.)  On December 29, 2004, the ALJ issued his second

7  decision, again denying benefits.  (CAR 15-19.)  The Appeals Council denied

8  plaintiff's request for review, making the decision of the ALJ the final

9  decision of the Commissioner in that matter. (CAR 7-10.)  See 20 C.F.R. §

10  404.900(a)(5).

11  **B.      Relevant Facts Regarding Plaintiff's Personal History, Medical**

12  **Condition and Treatment**

13       Born August 21, 1945, plaintiff was fifty-nine years old at the time of

14  the second administrative hearing.  (CAR 16, 76.)  Plaintiff has a high school

15  (equivalent) education (CAR 16, 105) and past relevant work experience as

16  phlebotomist, security officer and housekeeper. (CAR 16, 19.)  Plaintiff

17  alleges that she became disabled on September 28, 2000, due to high blood

18  pressure, heart problems and osteoarthritis, with the primary focus of her

19  claim being pain in multiple parts of the body, particularly her hands and

20  knees.  (CAR 99.)

21       Plaintiff had been seeing Dr. Consuelo Ocampo for various problems

22  since at least October 1999.  At that time, plaintiff complained that her

23  fingers  were swollen, stiff, and painful; examination by Dr. Ocampo revealed

24  that plaintiff's DIP joints were swollen.  (CAR 202.)  In November 1999,

25  plaintiff complained of chest pain with radiating numbness to the left.  (CAR

26  201.)

27       Plaintiff did not return to Dr. Ocampo until September 6, 2000, when

28  she complained of hot flashes and sweating, and she wanted to discuss diet

1  pills.  The assessment was that plaintiff was obese (CAR 199):

2  Dr. Ocampo's records indicated that plaintiff's weight was generally between

3  195 pounds to 205 pounds (CAR 192-202, 269).  Height entries in

4  plaintiff's medical record ranged from 4' 11 1/2" (CAR 269, 474) to 5' 2"

5  (CAR 197).

6      Visits in October and November were for complaints of chest pain,

7  dizziness, shortness of breath, palpitations, and vomiting.  (CAR 195-97.)

8      On December 13, 2000, plaintiff was seen at the Inland Valley

9  Regional Medical Center for evaluation of her complaints of chest pain.  An

10  adenosine cardiolite test revealed moderate anterior septal ischemia.  (CAR

11  151-52.)  However, a cardiac catheterization performed on January 11,

12  1002, when plaintiff was hospitalized for crescendo angina (CAR 159),

13  revealed normal coronary arteries and normal left ventricular function. The

14  prior adenosine cardiolite study was deemed falsely positive.  (CAR 161.)

15  Prinzmetal angina (coronary vasospasm) was suspected.   Michael Vargas,

16  M.D. thought that plaintiff's complaints might be supratentorial, resulting

17  from family stress, and she was prescribed Paxil.  (CAR 161-62.)

18      Notwithstanding the relatively benign cardiac findings, plaintiff

19  continued to complain of symptoms such as shortness of breath, chest pain,

20  dizziness, and dysphagia  (CAR 169, 190, 192, 193); Dr. Vargas' diagnosis

21  was of angina and questionable GERD (Gastro Esophogeal Reflux Disease)

22  (CAR 193).

23      On September 9, 2001, plaintiff presented in the emergency room at

24  Loma Linda University Medical Center with a six day history of nausea and

25  vomiting, dark stools, fever and chills; examination revealed epigastric

26  tenderness.  (CAR 238, 240.)   A CT scan of the abdomen and pelvis

27  revealed an enlarged kidney, consistent with acute pyelonephritis, severe

28  diverticulosis of the sigmoid colon with suggestions of mild inflammation,

1    hiatal hernia, and no evidence of bowel perforation.  (CAR 252.)  Laboratory
2    workup indicated an elevated white blood count, and in light of her "fairly
3    severe pain," she was admitted as an inpatient (CAR 239) from September
4    10 to September 12, 2001 (CAR 236).  During her admission, plaintiff
5    underwent further testing, including an esophago-gastroduodenoscopy
6    ("EGD"), which revealed grade four reflux esophagitis, Barrett esophagus,
7    ulceration at the mucosal junction, hiatal hernia, moderate flat erosive
8    gastritis, small healing gastric ulcer, and duodenitis.  (CAR 236; see CAR
9    248.)

10        Plaintiff was seen in follow-up by Dr. O'Campo for complaints of
11   abdominal pain and vomiting on September 17, 2001 (CAR 270), October
12   2, 2001 (CAR 269), and October 29, 2001 (CAR 268).

13        On February 21, 2002, plaintiff went to the emergency room at
14   Riverside County Regional Medical Center; she complained of epigastric
15   pain and difficulty swallowing.  Plaintiff had exhausted her medication two
16   weeks earlier.  (CAR 286.)  She was treated and discharged with instructions
17   to follow up with the clinic (CAR 287), where she was subsequently seen on
18   February 28, complaining of intermittent abdominal pain at a level 4/10 for
19   three days with vomiting, intermittent dysphagia, and chills.  Plaintiff also
20   complained of shortness of breath and dyspnea on exertion after walking one
21   block and joint pain.  (CAR 282.)  She was referred to the gastroenterology
22   department for another EGD and Prevacid was increased.  (CAR 281.)  On
23   March 5, 2002, plaintiff went to the clinic with complaints of epigastric pain
24   at a level five.  (CAR 291.)  On March 22, 2002, plaintiff went to the
25   emergency room because she was out of her medication, but she had no
26   specific complaints.  (CAR 301.)

27        Thereafter, plaintiff received care on a regular basis for her ongoing
28   complaints of abdominal pain, vomiting, dysphagia, diarrhea and reflux

1    (CAR 294, 298-99, 312, 317, 328, 331, 339, 342, 344-45, 411, 412-13,

2    418, 432-33, 435) unrelieved by medications (CAR 342, 344-45, 349, 413),

3    and on multiple occasions, she received medical care in the emergency room

4    for these same complaints (CAR 350, 425-26).  Findings on examination

5    revealed epigastric tenderness.  (CAR 339, 409, 412, 413, 433, 435, 469,

6    482 for example.)

7        Plaintiff also underwent further extensive testing.  An Upper GI taken

8    on May 7, 2002, revealed a hiatal hernia and reflux.  (CAR 296; see CAR

9    374-75.)  An EGD performed in July 2002 revealed a gastric ulcer.  (CAR

10   357-58, 362-63.)  A repeat EGD performed on January 16, 2003, and a

11   colonoscopy and a biopsy revealed an antrum nodule but no further ulcers;

12   there was a small hiatal hernia and diverticulosis, spasm, hemorrhoids, and

13   mild erythema of the colon of uncertain significance.  (CAR 319-20; see

14   CAR 379.)

15       On June 24, 2003, plaintiff went to the surgery clinic, where she

16   progressively worsening epigastric pain with some short-lived relief with

17   Vicodin and Elavil.  The EGD results of January 16, 2003, and the

18   unremarkable results of an ultrasound of June 5, 2003 were reviewed.

19   Assessment was of GERD and hiatal hernia, and a Nissen operation was

20   considered. However, in light of plaintiff's vomiting, surgery was considered

21   problematic.   (CAR 421.)

22       An ultrasound of July 14, 2003 was reported to be positive for reflux

23   associated with hiatal hernia.  Plaintiff was also positive for fatty liver.  (CAR

24   413.)  On September 30, 2003, plaintiff underwent a probe and manometry,

25   and in October, 2003; plaintiff was advised that the likelihood of a positive

26   surgical outcome was not good.  (CAR 410.)

27       Plaintiff underwent further testing on November 26, 2003:  a gastric

28   antrum biopsy revealed benign gastric mucosa.  Distal esophagus biopsy

6

1   revealed focal intestinal metaplasia, mild chronic inflammation, and no
2   dysplasia.  (CAR 405.) An MRI of the abdomen taken on May 18, 2004 was
3   normal (CAR 479), as was an abdominal CT scan.  (CAR 482.)  Radiological
4   studies were said to reveal a small hiatal hernia and moderate to massive
5   reflux.  (CAR 469, 482.)

6       In the meantime, plaintiff continued to receive follow-up treatment at
7   the various clinics for her ongoing epigastric complaints.  (CAR 407, 472,
8   481.)  On August 19, 2004, plaintiff reported that she wished to see the
9   surgeon for a Nissen fondoplization operation.  (CAR 460.)

10      Correspondingly, plaintiff received continual treatment for
11  musculoskeletal/joint pain.  On March 12, 2001, in addition to her
12  complaints of chest pain, plaintiff complained of swollen hands.  (CAR 193.)
13  On April 23, 2001, plaintiff had complaints of pain in her hands, joints, and
14  feet.  There was, however, no edema.  Diagnosis was of degenerative joint
15  disease, and Vioxx samples were dispensed.[2]  (CAR 192.)  Plaintiff returned
16  to Dr. Ocampo on July 3, 2001:  she  complained, inter alia, of a long history
17  of severe pain in the hands, back, and legs.  Physical examination revealed
18  tenderness in her hands.  The diagnosis included degenerative joint disease;
19  and she was given samples of Celebrex.  (CAR 190.)

20      On August 18, 2001, plaintiff underwent an internal consultative
21  examination with Dr. Mansurur Khan.  The doctor reviewed treatment notes
22  from her primary care physician dated 1998 and 2001.  Plaintiff told Dr.
23  Khan that she had arthritis of the hands, elbows, back, shoulders, hips,
24  knees, ankles and toes, with daily swelling of her joints.  She also reported
25  that occasionally her joints turned red and warm. Symptoms began twenty
26  years earlier but intensified over time.  Increased use of her hands, knees and

27
28      [2]  The district office employee who assisted in taking her application
    noted that plaintiff had difficulty using her hands and writing.  (CAR 96.)

1   feet worsened the pain.  Stooping and lifting increased the back pain, but she
2   denied any radiating symptoms to her lower extremities.  She also reported
3   some morning stiffness lasting about an hour after waking up.  Although she
4   had been taking Celebrex on a daily basis, she derived no benefit.  Plaintiff
5   told Dr. Khan that her doctor "deemed her disabled," and although she did
6   some light cooking and walked approximately ten minutes at most, her
7   husband and daughter performed most of the household chores.  (CAR 181.)

8        Physical examination found plaintiff to be obese in no acute distress.
9   Height without shoes was 58 3/4", and weight was 201 pounds.  (CAR 182.)
10  Plaintiff manifested tenderness to palpation in multiple areas, but there was
11  no obvious deformity, swelling, synovial thickening, effusion or erythema.
12  Motor strength was normal in all extremities, including in bilateral handgrip.
13  (CAR 183.)   She also had good range of motion in most joints.  Sensation
14  and reflexes were normal.  Diagnosis was of arthritis.  No x-rays were
15  available at that point (CAR 184), but x-rays of the hands taken that same
16  day revealed only mild osteoarthritis, greatest at the DIP joints (CAR 185.)
17  Based on the examination and plaintiff's history, Dr. Khan determined that
18  plaintiff could stand or walk for about six hours.  She could lift or carry
19  approximately twenty pounds occasionally and ten pounds frequently.
20  However, "[s]he may be expected to have frequent postural limitations.  She
21  may be expected to have frequent manipulative limitations."  (CAR 184.)

22       On September 4, 2001, plaintiff again complained of swelling in her
23  hands, feet and face.  She had pain in her legs and hands.  Examination
24  revealed edema.  She was prescribed Celebrex.  (CAR 189.)  By then,
25  plaintiff no longer had insurance.  (CAR 189; see also CAR 191.)

26       On February 28, 2002, in addition to her gastrointestinal complaints,
27  plaintiff complained of joint pains in the bilateral hands and knees and in
28  the right ankle.  She was injected with Kenalog, and the pain resolved.

8

1    (CAR 290.)  X-rays of the right knee taken on April 4, 2002, revealed mild

2    osteoarthritis of the right medial and patellofemoral compartments.  (CAR

3    378.)  X-rays of the right hand revealed minimal osteoarthritis of the second

4    and third distal interphalangeal joints.  (CAR 377.)  X-rays of the left hand

5    revealed mild osteoarthritis of the first interphalangeal joint.  (CAR 376.)

6          On  April 9, 2002, plaintiff was seen in follow up for complaints of

7    increased epigastric and joint pains which were impairing her ability to carry

8    on activities of daily living.   (CAR 298, 299.)

9          Plaintiff was seen in the rheumatology department on May 31, 2002;

10   she complained of pain in the knees, wrists, shoulders, and hands which

11   increased with movement and decreased with rest and medications.  There

12   was morning stiffness of the joints.  Physical examination revealed that

13   plaintiff had multiple tender points but no swelling, erythema, or redness,

14   except that there was  swelling in the right knee and right elbow as well as

15   "hard nodules" at the left PIPs (proximal interphalangeal)and right PIPs,

16   with tenderness.  Assessment was of rheumatoid arthritis.  (CAR 292.)

17         On June 27, 2002, plaintiff was supposed to have undergone an

18   exercise tolerance test, but she was limping and said that she could not walk

19   a treadmill.  Therefore, a pharmacological study was recommended.  (CAR

20   343.)

21         On July 9, 2002, plaintiff went to the internal medicine clinic for

22   follow-up on her complaints of epigastric pain and diffuse joints pains not

23   helped by Celebrex but relieved with Vicodin.   Physical examination

24   revealed epigastric tenderness and tenderness in the joints.  (CAR 339.)   On

25   July 18, 2002, Vicodin was refilled.  (CAR 327.)

26         X-rays of the left elbow taken August 22, 2002, revealed subchondral

27   cyst formation, but was otherwise normal.  (CAR 373.)  X-rays of the right

28   knee taken the same day revealed a small suprapatellar effusion and mild

1  degenerative changes.  (CAR 372.)  X-rays of the left knee revealed small

2  suprapatellar effusion.  (CAR 370.)   X-rays of the left hand were unchanged

3  from that of April 4, 2002.  (CAR 371.)

4        On August 23, 2002, plaintiff went to the rheumatology department

5  for follow-up.  She presented with severe joint pain and swelling, particularly

6  in the left shoulder and left hip for the previous two and one-half weeks.

7  She reported a five-week history of increased severity of pain in all affected

8  joints.  She had difficulty walking, she could not hold a cup.  She had

9  morning stiffness lasting forty-five minutes before her pain resolved.  She

10  was still awaiting approval for Celebrex.  Physical examination revealed

11  swelling, warmth, and tenderness in multiple joints.  There was palmar

12  erythema.  Plaintiff was in moderate distress secondary to the pain.  X-ray

13  results were still pending at the time of the examination, and rheumatoid

14  arthritis was still suspected.  Plaintiff received a depomedrol shot;

15  Methotrexate therapy was tried.  (CAR 346.)

16        On September 12 2002, plaintiff complained of a flare up of her

17  arthritis; she requested Vicodin, which had been discontinued.  The

18  examining source observed that "Pt looks to be in pain."  Physical

19  examination revealed tender joints at the PIPs and MCPs

20  (metacarpophalangeal) in the bilateral hands, the wrists, and the knees and

21  ankles.  (CAR 345.)  Doctors prescribed Vicodin amitriptyline was increased.

22  Anti-reflux measures were discussed for her epigastric complaints.  (CAR

23  344.)

24        On December 12, 2002, plaintiff complained of sinus headaches and

25  pain in the hands and knees.  Findings included bilateral synovitis in the

26  hands, knees, and ankles.  (CAR 328.)

27        On January 16, 2003, plaintiff was seen in the rheumatology clinic for

28  complaints of arthralgias over the upper extremities and the knees.  She

reported that her current pain regimen was not working very well and that she had fallen secondary to pain and weakness. She wished to have a cane. She was out of Celebrex and had not been taking Methotrexate for a month. Examination of the extremities revealed no crepitus but decreased range of motion and muscle strength. There was 4/5 warmth at the MCPs and PIPs. The assessment was arthralgia secondary to rheumatoid arthritis. The Celebrex dosage was increased; Methotrexate was again prescribed; and a cane was given to help with ambulation. (CAR 314.)

During her next visit to the rheumatology clinic on February 14, 2003, plaintiff reported continued pain in her joints and burning and tingling in the bilateral legs. Physical examination revealed no swelling or erythema/heat but tenderness in all finger joints and at the elbows. There was bilateral swelling at the knees, right more than left. Assessment was of rheumatoid arthritis with generalized synovitis, still symptomatic. Plaintiff was directed to discontinue Celebrex and begin Prednisone. (CAR 310.)

On May 23, 2003, plaintiff went to rheumatology with complaints of pain in the back, knees and hips for two days. She still had pain in the bilateral DIPs, PIPs and MCPs. She reported that she had been unable to sleep due to pain, and she indicated that she would like a cane. Laboratory work was reported to reveal a negative ANA (antinuclear antibodies). Physical examination revealed her to be alert but appearing to be in pain. She was on Plaquenil, Methotrexate, Prednisone and amitryptiline, but her symptoms were poorly controlled. Prednisone and Methotrexate were increased. (CAR 434.)

On June 27, 2003, plaintiff was seen in the rheumatology clinic for her MCP/PIP/DIP pain and her hand, shoulder, elbow, knee and left hip pain. She also complained of tingling in the hands and feet and cramps in the right plantar surface. She reported difficulty walking and requested a four-

1   pronged cane and "new RA" meds.  She had no complaints of nausea,
2   vomiting, diarrhea or abdominal pain.  Examination revealed full but painful
3   range of motion in the joints.  Doctors noted swelling in the elbows and
4   knees.  Assessment was of myalgia or fibromyalgia, rheumatoid arthritis
5   versus osteoarthritis.  Methotrexate was discontinued because of lack of
6   improvement.  Exercise was recommended, and Vicodin and Elavil were
7   continued.  She was told to taper off Prednisone.  (CAR 420.)

8        On July 22, 2003, plaintiff went to the internal medicine clinic.
9   for her various epigastric complaints.  Physical examination of the
10  extremities revealed 5/5 motor strength but tenderness in almost all of the
11  joints with mild swelling in various joints.  (CAR 418.)

12       On August 2, 2003, she was seen in follow-up with complaints of
13  increased right knee swelling and pain controlled with Vicodin.  Findings
14  were of right hip tenderness to palpation, tenderness to palpation of the right
15  knee more than the left, increased swelling of the prepatellar area, decreased
16  range of motion and pain with full extension.  However, there was no edema,
17  erythema, or heat.  (CAR 416.)

18       On December 8, 2003, plaintiff went to the internal medicine clinic
19  and reported that she ran out of medications.  Physical examination revealed
20  tenderness in the epigastric area as well as tenderness in all joints (ankles,
21  knees, wrists, hands, elbows).  (CAR 409.)

22       On April 2, 2004, plaintiff was seen in the rheumatology department,
23  where she reported a pain level of 8/10 in the MCPs and PIPs.  She
24  complained of bilateral shoulder pain about 7/10 in intensity.  She had
25  bilateral knee pain right more than left.  She had pain in the right hip and
26  bilateral elbows with touch.  Plaintiff complained of a burning sensation in
27  the plantar surfaces of both her feet with swelling at the knees, fingers, and
28  hands.  There was increased fatigue and pain with ambulation.  She

reported that it took her about twenty minutes to get out of bed in the morning and that her husband helped her bathe.  She had stopped taking Methotrexate and Prednisone.  Objectively, she was in no acute distress. Examination of the extremities revealed tenderness to palpation at the bilateral shoulders, wrists, and elbows.  There was no edema, but her elbows and wrists were warm to the touch.  There was also tenderness to palpation, warmth to touch, and edema of the MCPs and PIPs.  Plaintiff reported tenderness to palpation at the bilateral knees but no edema or warmth. Assessment was of rheumatoid arthritis versus osteoarthritis.  (CAR 474.) She was to have further laboratory workup as previously requested, and her medications were adjusted.  (CAR 473.)

Plaintiff was again seen in the rheumatology department on June 25, 2004.  She reported extremely painful knuckles, elbows, and knees.  She also had a rash and itching on the right palm.  Plaintiff reported that she used her cane in the right hand.  Vicodin helped, but only for two or three hours; her pain was uncontrolled.  Physical examination revealed that plaintiff was in no acute distress, but that she was holding herself very still.  Ankles, knees and knuckles were hot, red, and swollen.  Range of motion was decreased. There was no evidence of rheumatoid arthritis, but at that time plaintiff had twelve of the eighteen tender points for fibromyalgia; a diagnosis of fibromyalgia was, in fact, made.  (CAR 467.)

On July 1, 2004, plaintiff was seen in the internal medicine department; her multiple complaints included debilitating joint pain.  She was weak and unable to do things.  She had run out of two of her medications.  Examination revealed palmar lesion decreased since her rheumatology visit.  Strength was 5/5.  (CAR 465.)

On September 24, 2004, plaintiff was seen in rheumatology; she had pain at a level of 8/10 with a history of fibromyalgia, questionable

13

rheumatoid arthritis, and multiple other medical problems.  She complained of worsening pain in the right knee.  She reported that she had fallen three times in the previous two to three weeks secondary to knee instability, and she walked with a cane.  Plaintiff complained of swelling and warmth of the knee.  She complained of stiffness of all digits that lasted fifteen minutes, resolving but with residual stiffness for the rest of the day.  Plaintiff reported that she was neither able to hold a cup nor cook food secondary to joint weakness.  The area of most severe pain was at the knuckles of both hands.  She also complained of left shoulder pain, worse with elevation.  She had right hip pain and slight pain in the ankles, elbows, left knee and feet.  Plaintiff was in no acute distress, but was uncomfortable, with an unsteady gait and right limp.  She was obese.  Examination revealed that she was unable to elevate fully her left arm; there was tenderness to palpation at the MCP and PIP joints, but no warmth or swelling; there was tenderness at the hips, right more than left.  Plaintiff felt tenderness to palpation at the anterior right patella and pain with movement; there was warmth and swelling of the anterior/medial right knee.  Ankles were tender to palpation.  Diagnosis was of fibromyalgia with little evidence of rheumatoid arthritis.  Physical therapy was recommended; x-rays of the bilateral knees, standing, were ordered.  She was directed to return in four to five months with laboratory workup.  (CAR 458.)  She had had two steroid injections to the right knee without relief, so no further injections were offered.  Osteoarthritis was diagnosed in the right knee, and a frozen left shoulder was suspected.  (CAR 457.)

In the meantime, at the request of her attorney, plaintiff saw Dr. Mark Jason on March 16, 2004, for an evaluation.  (CAR 524.)  Plaintiff reported her history of treatment for arthritic complaints; she indicated that she had "been seen only by students."  (CAR 440; see CAR 445.)  Her main problem

1    appeared to be severe pain in the right knee such that she could barely walk,

2    stand or move.  She also complained of pain in her fingers, shoulders "and

3    pretty much everywhere else."  Plaintiff told Dr. Jason that she was no longer

4    able to do housekeeping because she was unable to bend, turn, stand, lift or

5    carry anything.  She also complained that she had a hard time sitting too

6    long or standing for more than a moment.  She could only walk a short

7    distance before she had to rest.  Plaintiff walked with a walker in the right

8    hand.  She complained of constant pain at a pain level of seven or eight.

9    (CAR 440.)

10       Dr. Jason reviewed plaintiff's medical records and noted that there was

11   no laboratory workup to confirm a diagnosis of rheumatoid arthritis.  (CAR

12   440-41.)  Physical examination revealed plaintiff to be "extremely

13   overweight."  Plaintiff walked very slowly and deliberately with a walker to

14   support her right leg.  Otherwise, the examination proved unremarkable.  Dr.

15   Jason noted no swelling or other findings in the joints.  (CAR 441.)  Plaintiff

16   had painful but full range of motion of the cervical spine without spasm.

17   (CAR 441-442.)  Examination of the lumbosacral spine revealed difficulty

18   bending.  There was tenderness in multiple trigger points.  Examination of

19   the extremities revealed tenderness to the DIPs (distal interphalanjoal) but

20   none to the PIPs or MCPs with no swelling, heat, or deformities.  Findings

21   were unremarkable in the hands, wrists, elbows and shoulders although there

22   was pain on range of motion bilaterally.  Examination of the hips failed to

23   reveal any significant findings.  Plaintiff had severe pain in the knees with

24   very loud crepitus on range of motion of the right knee and moderate

25   crepitus on the left.  Examination of the ankles revealed tenderness and pain

26   bilaterally but full range of motion and no swelling, heat or deformity.  Feet

27   were extremely flat with tenderness and pain.  (CAR 442.)

28       Dr. Jason did not find any evidence of rheumatoid arthritis and felt

15

1    that plaintiff might have a correctable mechanical problem with the right

2    knee.  However, he felt that at the time of his examination, it was "totally

3    impossible" for plaintiff to work, "considering the way she has to walk and

4    the extreme amount of pain she has in her knee."  "Possibly if someone fixed

5    her knee she might be able eventually to get back to work," but he did not

6    see how she could function in her current condition.  "She can't stand or

7    walk very long.  She cannot bend over."  (Id.)  However, Dr. Jason did not

8    feel that plaintiff had any significant problems with her fingers, with only

9    mild osteoarthritis, despite her claims that she could not use her hands.

10   (CAR 442-43.)  The doctor added that "[s]he would obviously have severe

11   difficulty doing anything physical, considering her high blood pressure and

12   her obvious shortness of breath and sweats with any mild exertion."

13   Dr. Jason opined that plaintiff may need further cardiological evaluation to

14   assess this problem.  (CAR 443.)

15        On June 18, 2004, plaintiff received a referral Dr. Jamshid Tamiry for

16   an internal consultative examination.  Plaintiff complained of arthritis and

17   hiatal hernia.  Dr. Tamiry reviewed her medical records.  (CAR 444-45.)

18   Plaintiff reported to him that she had difficulty standing and walking.

19   However, she denied swelling or inflammation; like Dr. Jason, Dr. Tamiry

20   noted that there were no sedimentation rate or rheumatoid factor tests, and

21   ANA was negative.  (CAR 445.)

22        Physical examination revealed that without shoes, she was fifty-nine

23   inches tall and two hundred pounds.  Dr. Tamiry reported that plaintiff

24   walked with a cane and antalgic gait favoring the left leg secondary to left

25   knee pain.  (CAR 446.)  Although she could walk across the room without

26   the cane, her gait remained antalgic and slow.  Plaintiff also manifested some

27   difficulty getting on and off the examining table and changing positions

28   secondary to knee pain.  (CAR 447.)  Examination of the musculoskeletal

system was "performed with great caution." Active range of motion of the cervical spine was normal, but range was limited in the lumbar spine with flexion 70/90 and extension 20/25. Straight-leg raising was negative. (CAR 448.) Examination of the shoulders, elbows and wrists revealed no abnormalities. (CAR 448-49.) Examination of the hands also revealed essentially normal findings. Examination of the hips and ankles revealed no deformities, tenderness, loss of motion. However, in the knees, there was bilateral crepitus, left greater than right but no swelling, effusion or joint deformities. Right and left flexion were limited. (CAR 449.) Neurological examination was normal. Diagnoses were of hypertension, obesity, GERD (gastro-esophageal reflux disease)/hiatal hernia, and degenerative arthritis of the knees. (CAR 450.) Dr. Tamiry concluded that plaintiff could occasionally lift/carry ten pounds and less than ten pounds frequently. She could stand or walk at least two hours in an eight-hour day. (CAR 453.) She could sit about six hours in an eight-hour day. Pushing and/or pulling were not affected. Plaintiff could never climb; she could occasionally balance, kneel and crouch; and she could frequently crawl or stoop. (CAR 454.) She had no manipulative restrictions. (CAR 455.)

**C.     Testimony Before the Administrative Law Judge**

       1.     <u>Plaintiff's Testimony</u>

          a.  Hearing of November 22, 2002

Plaintiff testified that her date of birth was August 21, 1945, and that she had a twelfth grade education. She last worked on October 14, 2000, as a housekeeper. (CAR 495.) Her duties as a housekeeper required that she lift buckets of water weighing approximately twenty to twenty-five pounds. She had to clean walls; she was on her hands and knees to clean corners and toilets; she mopped; she changed bedding; she had to clean underneath the beds; she climbed stairs and ladders. (CAR 496-97.) Plaintiff stopped this

1    line of work because of the pain in her knees and her hands and because of

2    the bending requirements.  (CAR 497.)

3          Plaintiff also worked as a phlebotomist/supervisor.  She had to check

4    supplies and discard expired items.  She had to lift boxes weighing fifteen

5    pounds.  She taught students how to draw blood, and she kept logs.  She

6    could no longer perform this job because of her hands.  She did not "like to

7    stick a patient more than once."  (CAR 497-98.)  She further testified that

8    this job required standing much of the time, and she had to stand one and

9    one-half to two hours.  (CAR 499.)

10         Plaintiff testified that her pain is constant, like a toothache.  She also

11   has pain spanning from her ankle to her hip on the left and from the knee to

12   the hip on the right.  On the day of the hearing, she had pain in her knees,

13   ankles, and hands.  She candidly admitted that she did not feel fatigued.

14   (CAR 499.)

15         As a consequence of pain, plaintiff has not driven since October 2000.

16   Her daughter drove her to the hearing, and even then, plaintiff had to stop

17   along the way.  She has to stop every half hour or so, but it takes her about

18   ten minutes to get out of the car.  She then walks around for about five or

19   ten minutes.  (CAR 500.)  Plaintiff, according to her testimony, uses a cane

20   whether she is outside or at home.  Her husband helps her get up the stairs.

21   Her husband also helps her get out of bed, which process takes her about

22   fifteen minutes; he prepares her shower, he helps her put soap on her back

23   and legs, and he helps her wash her hair.  (CAR 501-02.)  He also helps her

24   dress.  (CAR 502.)

25         Plaintiff has no hobbies, but she walks inside the small trailer where

26   she lives. (CAR 502.)  After about ten to fifteen minutes, she has to stop

27   because of pain.  (CAR 505.)  She can sit for about ten to twenty minutes

28   before she has to get up because of leg pain.  She can stand for about twenty

1  to thirty minutes with her knee or foot up.  (CAR 502-03.)

2  She spends about an hour per day watching television, and she reads.

3  (CAR 503-04.)  She loves to cook but she can no longer do so.  Her husband

4  leaves things in the microwave for her.  She cannot even boil water because

5  she cannot pick up the pot.  She cannot hold a glass.  The heaviest thing she

6  can hold is half a cup of coffee.  She lies down during the day for about

7  twenty to forty minutes to say her prayers.  (CAR 504.)

8  Plaintiff has two daughters.  One visits her three times a month to

9  help with the housework and the other comes once a week to take plaintiff's

10  husband to the store.  Plaintiff's husband has not worked since he suffered a

11  stroke.  (CAR 507.)  One of plaintiff's daughters also mails bill payments.

12  Plaintiff used to do this, but now she cannot write checks or money orders.

13  Plaintiff reported that she probably could do this task if she forced herself,

14  but it hurts a lot.  Plaintiff does, however, write prayers six times a day for

15  ten minutes.  (CAR 508.)

16  Plaintiff testified that the medications she takes help her pain but do

17  not completely relieve her pain.  The effects last only about an hour, and she

18  has burning pain, even with the medications.  (CAR 505.)  She also takes

19  amitryptiline for sleep, which is effective for about two hours.  Even with

20  this medication, she awakens every one and one-half to two hours and

21  remains awake for about forty-five minutes.  (CAR 506.)   She does not have

22  any side effects from the arthritis medication, but one medication makes her

23  drowsy and shaky.  (CAR 507.)

24  b.    Hearing of October 26, 2004.

25  Plaintiff testified that she still suffers from pain in the right knee,

26  hands, and left shoulder.  (CAR 514.)   She has knee pain almost all day.

27  She elevates the right knee about five times daily for about an hour each

28  time.  She has done this for approximately a year.  (CAR 515.)  She also

1   puts warm towels on her knee, but this does not help much.  (Id.)  Plaintiff

2   has fallen several times because her knee gives out.  She is currently using a

3   pronged cane which had been prescribed approximately eight to nine months

4   before the hearing.  She uses this cane on a daily basis, even at home.  (CAR

5   516.)

6        Plaintiff currently takes Vicodin, which she had been taking for about

7   three years before the hearing, twice a day; the Vicodin only occasionally

8   helps for about two hours.  (CAR 515, 519.)  It has not helped much

9   recently.  (CAR 520.)  She has asked her doctor to change the medication,

10   but the doctor keeps telling her to take it.  (CAR 519.)

11        Plaintiff testified that Tramadol, which she had been taking for about

12   six months, was also of no benefit.  (CAR 520-21.)  She also took

13   Methotrexate for about two months.  (CAR 521.)  Her current medical

14   regimen originated with Riverside County Medical Center in Moreno Valley.

15   (CAR 515.)  Dr. Jason, who provided a report in plaintiff's behalf, only saw

16   plaintiff one time at the request of her attorney.  (CAR 524.)

17        As for her hand pain, plaintiff clarified that the pain was actually in

18   the knuckles.  She complained that she "can't do anything."  She drops

19   everything.  (CAR 515-16.)  Although she can pick up a coffee cup, after one

20   sip, it falls.  (CAR 516-17.)   In addition to the medication, plaintiff

21   sometimes puts on a cream which her daughter bought for her, or her

22   daughter would rub her hands.  (CAR 516.)

23        Plaintiff also has pain in the left shoulder.  She cannot raise her arm

24   above shoulder level.  She is right handed.  (CAR 518.)

25        Plaintiff again testified that she needs assistance with bathing and

26   dressing.  She needs help getting into and out of the bathtub or shower.  Her

27   husband puts a chair in the shower; he helps her wash.  He sets out her

28   clothes and helps her put them on.  (CAR 517.)

20

1    Her daughters do the housework in shifts.  They come once a week on

2    Saturdays.  Plaintiff tries to vacuum, but she cannot.   Her husband takes

3    her for a ride or to the park.  She tries to walk, but she cannot.  (CAR 518.)

4    She still does not drive because of her knee.  (CAR 518-19.)

5    At the time of the hearing, plaintiff weighed 206 to 207 pounds.  She

6    attributed the slight weight gain to the fact that her reflux disease requires

7    her to consume a lot of liquids.  (CAR 517.)  The reflux disease also causes

8    burning pain in the stomach.  (CAR 517-18.)

9         2.    Vocational Expert's Testimony

10   The VE testified that plaintiff's job as a security officer from 1990 to

11   1997 was performed in the "narrow range of light work" and was "marginally

12   semiskilled."  (CAR 521.)  Her job as a housekeeper in a medical center from

13   1998 to 2000 was unskilled.  Although it is generally a light job, since she

14   had to operate buffers "which required about 30 pounds of pressure," he

15   would classify the job as "light with incidental requirements for medium

16   work."  (CAR 522.)

17   A hypothetical individual with the limitations purportedly found by

18   consultative examiner, Dr. Jamshid Tamiry[3] (compare CAR 453-54 with

19   CAR 522), according to the VE, was limited to the sedentary range of work

20   and could not perform plaintiff's past relevant job as performed.  However,

21   her job of security officer provided skills transferable to the sedentary level

22   for jobs such as that of gate guard, identification clerk, and information

23   clerk.  The number of such jobs "[i]n the broad regional economy [was] well

24

25

26        [3] The hypothetical individual could sit for approximately two of eight
     hours.  (CAR 522.).  Dr. Tamiry indicated that plaintiff could sit for about six
27   hours in an eight-hour workday and stand/walk for at least two.  (CAR 453-
     54.)  However, from the VE's responses, it appears that he was contemplating
28   an individual capable of a substantial amount of sitting.  (CAR 523.)

in excess of 2,000" jobs.  The VE further testified that in view of her seven years' experience as a security officer, vocational adjustment would be minimal.  (CAR 522-23.)

Based upon the State agency assessment, plaintiff could perform the full range of light work which would permit performance of the past relevant work as security officer.  (CAR 523-24.)

Thereafter, the VE testimony becomes somewhat confusing. Plaintiff's counsel asked:

ATTY:      First, let me clarify information on the past work.  The security position, what was the DOT[4] number of the past job in security?

VE:         The security position would be the same as the information clerk or similar 227.467-010, SVP[5] 3, marginally semiskilled.

ATTY:      What's the title of that job?  What's it called?

VE:         Security clerk.

ATTY:      Security clerk?

---

[4]   "The DOT is 'the Secretary's primary source of reliable job information.'" Johnson v. Shalala, 60 F.3d 1428, 1434 n. 6 (9th Cir. 1995), quoting Terry v. Sullivan, 903 F.2d 1273, 1276 (9th Cir. 1990).

[5]   "'SVP' stands for 'specific vocational preparation' and is defined in the U.S. Department of Labor's Dictionary of Occupational Titles (4th ed.1991) at 1009 as 'the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job- worker situation....It does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job.' An SVP of 3 means that specific vocational preparation of over one month and up to and including three months is required."  Khuu v. Chater, 12 F.Supp. 2d 1028, 1030 n.4 (C.D. Ca. 1997)(Internal citation omitted.).

22

1    ALJ:        I think he's asking about past relevant work, not the jobs
2                to which you said skills would transfer.
3    (CAR 524.)

The VE then answered that the job title would be "security officer,"
and when plaintiff's counsel asked whether the DOT number was the same
as for the information clerk, the VE answered, "Similar, yes."  When pressed
for the exact DOT number, the VE indicated that he did not have that
information at hand but that he would provide it after the hearing.  (CAR
525.)

However, plaintiff's past relevant work was subsequently identified as
that of security guard, DOT 372.667-034, light, SVP 3.  (CAR 526; see CAR
129.)

Recapitulating the VE's testimony, plaintiff's counsel then inquired:

ATTY:       All right, now the work you've stated she has transferable
            skills to that is the DOT 237.467-010?[6]
VE:         Yes.
ATTY:       And that's called information clerk?
VE:         The information clerk, 237.367-010, the counter clerks,
            211.462-014.
(CAR 426.)

 The VE further identified transferable skills to "the guard positions,
ID clerks, what have you, [which] are similar security guard positions, watch
guard, patrol guard, all with the same DOT number, 372.667-034, which

_____

[6] The VE testified that the job of security clerk, the same as
information clerk, was DOT 227.467-101.  (CAR 524.)  There is no job with
DOT number 227.467-010 or 237.467-010.  The correct number appears to
be the 237.367-010 number later identified by the VE.  (CAR 526.)  This job
titled "appointment clerk," is sedentary, and has an SVP of 3.

23

1   were light.

2        Challenging the VE's prior testimony that these jobs could be

3   performed seated (CAR 523), plaintiff's counsel then inquired:

4       Q.         So they cannot be performed if you're limited to

5                  sedentary?

6       A.         But there would be transferable skills given her GED and

7                  her . . . seven years of work performance.

8   (CAR 527.)

9        The ALJ then clarified that plaintiff's counsel wanted to know the jobs

10   at the sedentary level to which skills would be transferable.  (Id.)  However,

11   this led to more confusion:

12       A.         Oh, at the sedentary level?

13       Q.         Yeah.

14       A.         It is not indicated in this part of the –

15       Q.         Well –

16       A.         – in the DOT.

17       Q.         I thought you cited jobs of gate guard, identification clerk

18                  and information clerk?

19   (CAR 528.)

20        However, the VE, whose earlier testimony suggested that these jobs

21   were sedentary (CAR 523), now indicated that "according to the DOT they

22   would fall in the lighter range," although "there's many that follow the

23   sedentary range."  Thus, it is unclear whether the excess of 2,000 jobs the

24   VE previously cited was the number of light exertion jobs or whether his

25   estimate was specifically limited to the subset of sedentary work.  (CAR

26   523.)  The later testimony suggests that it was not so limited.  (CAR 528.)

27        Upon further questioning by plaintiff's counsel, the VE indicated that

28   the gate guard position did not "necessarily" have the same DOT number as

the past work.  (Id.) This is contrary to his earlier testimony that the "guard

positions, ID clerks, what have you, are similar security guard positions"

with the same DOT number, 372.667-034. (CAR 527.)  However, the VE

emphasized that plaintiff had transferable skills.  He identified these skills as

the ability to maintain a logbook, call in every thirty minutes, maintain a

record of activities, report unusual incidents, be alert, and write at the

semiskilled level.  The VE also factored in that plaintiff has a GED, "so you

put that all together and yes, there's as I indicated marginable  [phonetic],

yes, of transferable skills."  (CAR 529.)

Plaintiff's counsel then inquired:

ATTY:      You're saying that these things you just recited are skills
           she obtained?

VE:        Yes with seven years of performance, yes plus a GED.

ATTY:      And–well, how does a GED have anything to do with what
           skills she obtained?

VE:        From education that she has has been applied in dealing
           with writing incidence reports, observation of physical
           facilities, of people's behavior and recording and calling at
           30-minute intervals to a call operator, maintain a logbook.

(CAR 530.)

Questioning the VE's testimony that plaintiff had transferable skills,

plaintiff's counsel then asked for his definition of transferable skills.  The VE

testified that "usually it's the work or functions that are involved.  It's the

second three digits that are on the DOT code."

A.      For example this one simply means – the security guard
        simply mean[s] you're interactive verbally [INAUDIBLE]
        and writing with the general public and with coworkers.
        When you look up the other jobs you'll find that they do

25

1          require a higher degree of dealing with data and

2          information, compiling, copying, [sic] data and

3          information and this differs from the job that she

4          performed to a degree, but when you factor in the GED, a

5          high school education as I indicated there would be

6          present minimal judgment requirements for transferability.

7          But it's the work and functions, the second three digits

8          that are important where you're working with dated

9          information, working with people, working with objects.

10    Q.   So the jobs you're saying she has skills transferable to are

11         at a higher level of skill than the past job?

12    A.   A higher level of working with data and information than

13         the DOT description of security officer okay?

14    Q.   I see.

15    A.   But when you factor in the GED, you know, she has –

16    Q.   She might be able to learn –

17    A.   [INAUDIBLE] –

18    Q.   –those jobs?

19    A.   – for transferability.

20    Q.   You're saying because she has a GED she may be able to

21         learn these other jobs?

22    A.   Yes.  The DOT is a rather fixed instrument and, you

23         know, it's not representative of the full spectrum of the

24         jobs as they exist.

25  (CAR 532-33.)

26         The VE went on to testify that with the limitations assessed by Dr.

27  Khan, "who said she would have frequent postural limitations and frequent

28  manipulative limitations," plaintiff could not do her past work or the other

26

1  alternate work he had previously cited.  In this hypothetical question,

2  plaintiff's counsel defined "frequent" in a way that is counter to the ordinary

3  usage of the word:  "less than occasional."   "Manipulative" was defined as

4  "gross and fine manipulation."  (CAR 534.)

5       The VE further testified that plaintiff's past work as a phlebotomist

6  was performed at the narrow range of light work and was semiskilled,

7  "preceded by training in 1983."  If plaintiff could perform light work, she

8  could return to this job.  There would be no transferable skills from this job

9  to a sedentary position.  (CAR 535.)

10

11              **III.  STANDARD OF REVIEW**

12       Under 42 U.S.C. § 405 (g), a district court may review the

13  Commissioner's decision to deny benefits.  The Commissioner's (or ALJ's)

14  findings and decision should be upheld if they are free of legal error and

15  supported by substantial evidence.  However, if the court determines that

16  findings are based on legal error or are not supported by substantial evidence

17  in the record, the court may reject the findings and set aside the decision to

18  deny benefits.  See McCartey v. Massanari, 298 F.3d 1072, 1075 (9th Cir.

19  2002); Tonapetyan v. Halter, 242 F.3d 1144, 1147 (9th Cir. 2001);

20  Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).

21       "Substantial evidence is more than a scintilla, but less than a

22  preponderance."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).  It is

23  "relevant evidence which a reasonable person might accept as adequate to

24  support a conclusion."  (Id.)  To determine whether substantial evidence

25  supports a Commissioner's findings, the reviewing court "must review the

26  administrative record as a whole, weighing both the evidence that supports

27  and the evidence that detracts from the Commissioner's conclusion."  (Id.)

28  "If the evidence can reasonably support either affirming or reversing," the

                          27

1   reviewing court "may not substitute its judgment" for that of the

2   Commissioner.  Reddick, 157 F.3d at 720-721; see also Osenbrock, 240 F.3d

3   at 1162.

4

5   ## IV.  THE FIVE-STEP ANALYSIS

6       A disability claimant must show that a medically determinable

7   physical or mental impairment prevents the claimant from engaging in

8   substantial gainful activity and that the impairment is expected to result in

9   death or to last for a continuous period of at least twelve months.  Reddick,

10  157 F.2d at 721; 42 U.S.C. § 423 (d)(1)(A).

11      Disability claims are evaluated according to the five-step procedure

12  described below.  See Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S. Ct.

13  2287, 96 L. Ed. 2d 119 (1987); Reddick, 157 F.3d at 721; Lester v. Chater,

14  81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996); 20 C.F.R §§

15  404.1520, 416.920.

16      **Step one:**  Is the claimant engaging in substantial gainful activity?  If

17  so, the claimant is found not disabled.  If not, proceed to step two.

18      **Step two:** Does the claimant have a "severe impairment"?  If so,

19  proceed to step three.  If not, then a finding of not disabled is appropriate.

20      **Step three:**  Does the claimant's impairment or combination of

21  impairments meet or equal an impairment in 20 C.F.R., Part 404, Subpart P,

22  Appendix 1 (hereinafter "the Listings")?  If so, the claimant is automatically

23  determined disabled.  If not, proceed to step four.

24      **Step four:**  Is the claimant capable of performing his past work?  If so,

25  the claimant is not disabled.  If not, proceed to step five.

26      **Step five:**  Does the claimant have the residual functional capacity to

27  perform any other work?  If so, the claimant is not disabled.  If not, the

28  claimant is disabled.  Lester, 81 F.3d at 828 n.5.

28

1    "Severe," (at step two) means any impairment or combination of
2    impairments that significantly limits the physical or mental ability to
3    perform basic work activities.  "Residual functional capacity" ("RFC") is
4    what a claimant can still do despite existing "exertional" (i.e, strength
5    related) and "nonexertional" limitations.  Cooper v. Sullivan, 880 F.2d 1152,
6    1155 ns.5-6 (9th Cir. 1989).  Nonexertional limitations restrict ability to
7    work without directly limiting strength, and include mental, sensory,
8    postural, manipulative and environmental limitations.  Penny v. Sullivan, 2
9    F.3d 953, 958 (9th Cir. 1993); Cooper, 800 F.2d at 1155 n.7; 20 C.F.R.
10   §404.1569a(c).
11         A claimant has the burden, through step four, of proving inability to
12   perform past relevant work.  Reddick, 157 F.3d at 721; Drouin v. Sullivan,
13   966 F.2d 1255, 1257 (9th Cir. 1992).  If this burden is met, a prima facie
14   case of disability is established and the burden shifts to the Commissioner at
15   step five to establish that the claimant can perform alternative work.
16   Reddick, 157 F.3d at 721; Drouin, 966 F.2d at 1257; 20 C.F.R. §§
17   404.1520,  416.920.  The Commissioner can meet this burden by reference
18   to the Medical-Vocational Guidelines ("Grids") at 20 C.F.R. Part 404,
19   Subpart P, Appendix 2, or by relying on vocational expert ("VE") testimony.
20   Osenbrock, 240 F.3d at 1162 (citing Desrosiers v. Secretary, 846 F.2d 573,
21   576-77 (9th Cir. 1988)).  If VE testimony is used, "the VE must identify a
22   specific job or jobs in the national economy having requirements that the
23   claimant's physical and mental abilities and vocational qualifications would
24   satisfy." Osenbrock, 240 F.3d at 1162-63.
25
26                          **V.   DISCUSSION**
27   **A.      The ALJ's Evaluation**
28         The ALJ found at step one that plaintiff has not engaged in substantial

29

1    gainful activity since the alleged onset of disability.  (CAR 19.)  The ALJ
2    determined at step two that plaintiff suffers from degenerative changes of the
3    musculoskeletal system and from obesity, an impairment or a combination
4    of impairments considered "severe" under 20 CFR § 404.1520(c).  (CAR
5    19.)  At step three, the ALJ found that plaintiff's impairments do not meet
6    or medically equal one of the listed impairments in Appendix 1, Subpart P,
7    Regulation No. 4.  (Id.)  The ALJ further determined that plaintiff's
8    "subjective complaints at the hearing credibly establish no different
9    conclusions and fail to credibly establish functional limitations greater than
10   that found herein."  He found that plaintiff retained the residual functional
11   capacity for light work. (Id., citing Exhibit 9F found at CAR 209-16.)   More
12   specifically, he concluded the following:  plaintiff retained the capacity to lift
13   and/or carry twenty pounds occasionally and ten pounds frequently; plaintiff
14   could stand and/or walk about six hours in an eight-hour workday; she could
15   sit about six hours in an eight-hour workday; her capacity for pushing and
16   pulling including operation of hand and/or foot controls was unlimited; and
17   plaintiff could occasionally climb, balance, stoop, kneel, crouch, or crawl.
18   Plaintiff had no manipulative, visual, communicative or environmental
19   limitations.  (CAR 210-13.)   At step four, the ALJ found that plaintiff
20   retained the residual functional capacity to perform her past relevant work as
21   a phlebotomist and a security guard "consistent with the vocational expert's
22   testimony at the hearing."  (CAR 19.)  In the alternative, the ALJ found that
23   even at the sedentary level, plaintiff had skills from her "security job" which
24   were readily transferable to "thousands of jobs in the regional economy with
25   minimal vocational adjustment."  He cited Medical-Vocational Rule 201.07
26   as fully supporting his conclusion of "not disabled."  (Id.)  Accordingly, the
27   ALJ concluded that plaintiff was not under a "disability" as defined in the
28   Social Security Act at any time through the date of the decision and thus,

30

1  plaintiff is not entitled to a period of disability or Disability Insurance

2  Benefits.  (Id.)

3         The parties have stipulated that the following issues are in dispute, to

4  wit:

5         1.     Whether the ALJ's rejection of the opinions of consultative

6                examiners Khan and Tamiry and his adoption of the State

7                agency reviewer "complies with the legal standards applicable to

8                evaluation of examining versus non-examining sources;"

9         2.     Whether the vocational expert's testimony satisfies the

10               Commissioner's burden at step five of proving the existence of

11               alternative jobs which plaintiff could perform;

12        3.     Whether the ALJ properly considered plaintiff's obesity into his

13               determination of residual functional capacity.

14  (Joint Stipulation, p 5.)

15  **B.     The ALJ's Reliance Upon the State agency opinion**

16         Two consultative examiners have provided medical source statements

17  concerning plaintiff's limitations – Dr. Khan and Dr. Tamiry.  A third

18  examining physician, Dr. Jason, also suggested that – at the time of his

19  examination at least – plaintiff was unable to perform any gainful activity.

20  The non-examining State agency physicians reviewed the evidence then

21  available and rendered their opinions concerning plaintiff's limitations.

22  Rejecting the opinions of the examining physicians, the ALJ relied upon the

23  non-examining State agency opinion.  In so doing, the ALJ erred.

24         The regulations provide for a hierarchy of medical opinion.  The

25  opinions of a treating physician are generally entitled to greater weight than

26  the opinions of a non-treating physician.  20 C.F.R. § 404.1527(d)(2);

27  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  If uncontroverted,

28  his opinions can only be rejected for clear and convincing reasons; even if

31

1    contradicted, generally, such opinions can be rejected only if the ALJ

2    provides specific and legitimate reasons for doing so.  Id.  However, no

3    treating physician has rendered any opinion concerning plaintiff's functional

4    limitations.

5           The opinions of an examining physician, in turn, are entitled to greater

6    weight than the opinions of a non-examining physician.  Andrews v. Shalala,

7    53 F.3d 1035, 1041 (9th Cir. 1995).  As in the case of the treating physician,

8    if the uncontradicted opinions of an examining physician are to be rejected,

9    clear and convincing reasons must be provided, and specific and legitimate

10   reasons are required to reject even the controverted opinions of an examining

11   physician in favor of the contrary opinions of a non-examining physician.

12   Lester, 81 F.3d at 830-31.

13          Last in the hierarchy are the opinions of non-examining physicians.

14   Such opinions, without more, cannot constitute substantial evidence.

15   Andrews, 53 F.3d at 1042.  However, the opinion of non-examining

16   physicians can constitute substantial evidence if "it 'is not contradicted by

17   all other evidence in the record'" (emphasis in original), Id., at 1041, quoting

18   Magallanes, 881 F.2d at 752,  and [is] supported by other evidence in the

19   record and [is] consistent with it."  Andrews, 51 F.3d at 1041.

20          Reliance upon the State agency opinion is problematic for a number of

21   reasons.  First, in assessing plaintiff's musculoskeletal impairment, the State

22   agency relied primarily upon the opinion of Dr. Khan.  (See CAR 208.)  To

23   the extent that Dr. Khan's opinion diverges from that of the State agency,

24   there is no explanation for the State agency's deviation, and the opinion of a

25   non-examining source, without more, cannot constitute substantial evidence.

26   Andrews, 53 F.3d at 1042.

27          The ALJ, however, rejects the opinions of Dr. Khan as "cryptic and

28   undefined."  (CAR 17.)  In reality, the only variance between Dr. Khan's

32

opinion and that of the State agency physician is that Dr. Khan found manipulative restrictions, whereas the State agency physician found none. (CAR 184, 212.)   The ALJ found that Dr. Khan's assessment of frequent postural and manipulative restrictions was "unsupported by his examination or anything else in the <u>then-existing</u> record."  (CAR 17.)  (Emphasis added.) The ALJ added that plaintiff's examination revealed good range of motion and no arthritic stigmata. (CAR 17.)  Even so, and despite his rejection of this portion of Dr. Khan's opinion, the ALJ relies upon that opinion as support for his finding that plaintiff could perform light work.  (CAR 18; see JS, p. 11.)

However, both the State agency determination upon which the ALJ relied and Dr. Khan's assessment is outdated.  The State agency determination was made in September 2001, and affirmed at the reconsideration level in January 2002.  (CAR 30, 35, 216.)  Nearly three years had elapsed between Dr. Khan's evaluation and State agency determination and the date of the most recent consultative examination, that of Dr. Tamiry, which took place in June 2004; there is no evidence in the record to suggest that plaintiff's musculoskeletal complaints and findings remained static during this time period.  To the contrary, the treatment records submitted after Dr. Khan's evaluation and the State agency determination reveal that by the spring of 2002, plaintiff had ever-increasing complaints of both epigastric and joint pain and an inability to carry out daily activities.  (CAR 298; see also CAR 346-47.)  She required frequent adjustment of medications such as steroid injections, Methotrexate, Plaquenil, Prednisone and Vicodin in an attempt to control her pain. (CAR 290, 310, 314, 329, 331, 344, 345, 346, 409, 434.)  In April, she underwent diagnostic testing via x-rays. (CAR 376-78.)  Notwithstanding the findings of only mild osteoarthritic changes, by May 2002, her complaints warranted

1   a referral to a rheumatologist.  At that time, in addition to the multiple
2   tender points previously described,  there was swelling in the right knee and
3   right elbow as well as "hard nodules" at the left PIPs and right PIPs.  (CAR
4   292.)
5        In June 2002, plaintiff walked with a limp.  (CAR 343.)  X-rays taken
6   in August 2002, continued to show generally mild degenerative changes but
7   effusion was noted in the knees.  (CAR 370, 372.)  Also in August, physical
8   examination by the rheumatology department revealed not only tenderness
9   but swelling and warmth in multiple joints; plaintiff was observed to be in
10  moderate distress secondary to pain.  Health professionals administered a
11  Depomedrol shot; her doctors prescribed Methotrexate.  (CAR 346.)  One
12  month later, in September 2002, plaintiff was again observed to be in pain.
13  (CAR 345.)  In December 2002, clinical findings confirmed synovitis in the
14  bilateral hands, knees, and ankles.  (CAR 328.)
15       By January 2003, plaintiff reported falling due to pain and weakness.
16  Examination of the extremities revealed decreased range of motion and
17  muscle strength, although there was no crepitus.  There was also warmth at
18  the MCP and PIP.  In addition to the Celebrex and Methotrexate, plaintiff
19  was given a cane to her to help with ambulation.  (CAR 314.)  In February
20  2003, physical examination again revealed tenderness in the finger joints and
21  elbows, and there was bilateral swelling at the knees, right more than left.
22  Doctors prescribed Prednisone.  (CAR 310.)
23       On May 23, 2003, plaintiff reported continual pain and inability to
24  sleep.  Again, she was observed to be in pain.  Prednisone and Methotrexate
25  dosages were increased.  (CAR 434).  In June 2003, plaintiff reported
26  difficulty walking.  Examination revealed full but painful ranges of motion in
27  all joints; swelling was noted in the elbows and knees.  The Methotrexate
28  was discontinued due to lack of efficacy; plaintiff was prescribed Elavil and

1   Vicodin.  (CAR 420.)  In July 2003, swelling was again noted in various

2   joints, albeit mild.  (CAR 418.)  In August 2003, physical findings included

3   tenderness to the knees as well as increased swelling and decreased range of

4   motion.  (CAR 416.)

5           In April 2004, plaintiff complained of continual pain and increased

6   fatigue.  Examination revealed tenderness as well as warmth in the elbows,

7   wrists, and MCPs and PIPs.  Edema was also present in the MCPs and PIPs.

8   (CAR 474.)  In June 2004 examination, plaintiff manifested no acute

9   distress, but held herself very still.  Physical examination revealed that her

10  ankles, knees, and knuckles were hot, red, and swollen.  Range of motion

11  was decreased.  (CAR 467.)

12          In September 2004, plaintiff appeared to be uncomfortable, with an

13  unsteady gait and a right limp.  There was tenderness in various joints, and

14  warmth and swelling of the anterior/medial right knee.  The medical record

15  reflected that plaintiff had been given steroid injections in the past without

16  relief.  (CAR 457-58.)

17          In the meantime, in June 2004, Dr. Tamiry's observations indicated

18  that plaintiff walked with a cane and her gait was antalgic, favoring the left

19  knee.  He also observed that plaintiff had difficulty getting on and off the

20  examining table and changing positions due to knee pain.  (CAR 446-47.)

21  Examination of the knees revealed bilateral crepitus, left more than right.

22  Although the doctor did not find swelling, effusion or joint deformities, he

23  observed that plaintiff's range of motion was limited.  (CAR 450.)

24          Thus, these treating source findings of swelling, warmth, and crepitus

25  along with multiple observations of pain and discomfort and abnormal gait

26  were not evident during the earlier examinations which took place prior to

27  the State agency review.  The State agency's and Dr. Khan's conclusions that

28  plaintiff could perform light work was based solely on findings which were

1   demonstrably out-of-date at the time of the ALJ's decision.  However, the
2   ALJ gives short shrift to the more recent treatment findings, his only
3   comment being that the examinations were performed by medical students
4   and that the rheumatology clinic notes "document unfounded diagnoses of a
5   history of fibromyalgia,[7] questionable rheumatoid arthritis, hypertension,
6   gastroesophageal reflux disease and shingles which have resolved."  (CAR
7   18.)  Otherwise, he utterly fails to discuss the findings in the treatment
8   record or to  consider the supportability of Dr. Khan's and the State agency
9   opinion in light of the more recent evidence.  See SSR 96-6p (The opinions
10  of State agency medical consultants "can be given weight only insofar as they
11  are supported by evidence in the case record, considering such factors as the
12  supportability of the opinion in the evidence including any evidence received
13  at the administrative law judge and Appeals Council levels that was not
14  before the State agency, the consistency of the opinion with the record as a
15  whole, including other medical opinions, and any explanation for the
16  opinion provided by the State agency medical or psychological consultant or
17  other program physician or psychologist.")  Rather, the ALJ inexplicably
18  chooses to rely upon plaintiff's denial of swelling or inflammation at the time
19  of Dr. Tamiry's examination.  (CAR 17, 445.)  However, a review of the
20  examination record as a whole reveals numerous objective and contrary
21  findings, including findings of swelling and inflammation, and observations
22  of the treating sources.  See Penny v. Sullivan, 2 F.3d 953, 956   (9th Cir.
23  1993)(The Commissioner's denial of benefits must be supported by
24  substantial evidence on the record as a whole.)
25      In contrast to the report of Dr. Khan and the opinion of the State
26
    _____
27      [7]  The ALJ's opinion to the contrary, the treatment notes reveal that at
    least during one examination, plaintiff had twelve of the eighteen tender
28  points diagnostic of fibromyalgia.  (CAR 467.)  See Rollins, 261 F.3d at 855.

1    agency, the examination report of Dr. Tamiry is more recent; moreover, the
2    report is based, in part, on the doctor's review of updated records.  (CAR
3    445.)  However, the ALJ rejected Dr. Tamiry's opinion that plaintiff was
4    restricted to a limited range of sedentary work because of the lack of
5    objective findings.  The ALJ cited Dr. Tamiry's findings that plaintiff's blood
6    pressure appeared "reasonably well controlled," and emphasized that there
7    was no evidence of retinopathy, diastolic dysfunction or congestive heart
8    failure.  The ALJ also cited the lack of synovial thickening or inflammation,
9    the fact that there have been no laboratory findings confirming rheumatoid
10   arthritis, and the lack of "constitutional signs of arthritis such as anemia,
11   weight loss, fever, skin disorder, rash or alopecia."  (CAR 17, 445, 450.)

12         However, although plaintiff listed her blood pressure and heart
13   problems as impairments which limited her ability to work, the reason she
14   could not work was because of her osteoarthritis which caused her "lots of
15   pain."  (CAR 99.)   At the hearings in this matter, the focus of her
16   complaints was her pain.  When she saw Dr. Tamiry, her chief complaints
17   were of arthritis and hiatal hernia; Dr. Tamiry took the lack of significant
18   cardiovascular findings into consideration in assessing plaintiff's limitations,
19   which were based primarily upon his observations and findings, nowhere
20   acknowledged by the ALJ,  relating to plaintiff's knees.  (CAR 450.)
21   Therefore, that plaintiff's hypertension was controlled or that she had no
22   significant cardiovascular findings is not a legitimate reason for rejecting Dr.
23   Tamiry's opinion.  Similarly, although rheumatoid arthritis had been
24   suspected, this diagnosis had essentially been ruled out even by plaintiff's
25   treating physicians.  (CAR 457, 467; see also CAR 443.) The fact, therefore,
26   that there are no laboratory findings confirmatory of rheumatoid arthritis or
27   "constitutional signs of arthritis" is also of little relevance in rejecting Dr.
28   Tamiry's opinion.   The lack of a diagnosis of rheumatoid arthritis does not

1  preclude a finding of disability.  The issue is whether there is an disabling

2  medically determinable impairment, not whether she has rheumatoid

3  arthritis.  20 C.F.R. § 404.1508.

4         Dr. Tamiry found that plaintiff suffered from degenerative arthritis of

5  the knees; and the ALJ did not dispute this, finding that plaintiff had

6  degenerative changes to the musculoskeletal system.  (CAR 19; CAR 450.)

7  In support of his assessment, Dr. Tamiry noted the following:  range of

8  motion of plaintiff's knees was limited; there was evidence of crepitus; and

9  gait was antalgic.  (CAR 450, 456.)  Based upon these findings, his

10 observations of plaintiff (CAR 447), as well as his review of plaintiff's history

11 and her medical records (CAR 444-45, 451), Dr. Tamiry's opinion was that

12 plaintiff was limited to lifting/carrying only ten pounds occasionally and less

13 than ten pounds frequently and that plaintiff could stand and/or walk for at

14 least two hours in an eight-hour workday.  (CAR 453.) The ALJ's rejection of

15 this opinion, relying as he did on the lack of objective findings was not

16 sufficiently specific and legitimate.  See Rodriguez v. Bowen, 876 F.2d 759,

17 762 (9th Cir. 1989)("Merely to state that a medical opinion is not supported

18 by enough objective findings 'does not achieve the level of specificity our

19 prior cases have required, even when the objective factors are listed seriatim.'

20 . . . 'Disability may be proved by medically-acceptable clinical diagnoses, as

21 well as by objective laboratory findings.'   In addition, the ALJ must give

22 sufficient weight to the subjective aspects of a doctor's opinion." (Internal

23 citations omitted.))

24        Accordingly, the ALJ's rejection of Dr. Tamiry's assessment is not

25 based upon substantial evidence, and the ALJ's reliance upon the outdated

26 State agency opinion and assessment by Dr. Khan is not supportable based

27 on a review of the record as a whole.  This matter, therefore, requires remand

28 for further consideration of plaintiff's residual functional capacity and

1  further evaluation of the medical records and opinions.  See McAllister v.

2  Sullivan, 888 F.2d 599, 603 (9th Cir. 1989).

3        In this regard, although not specifically raised by plaintiff, there is also

4  the issue of plaintiff's gastrointestinal pain and symptoms.  In it's Order of

5  Remand, the Appeals Council found that the first decision "failed to

6  properly evaluate the severity of the claimant's gastrointestinal impairments

7  which include GERD, ulcers, and hiatal hernia.  Further evaluation of the

8  severity and effects of the claimant's rheumatoid arthritis and

9  gastrointestinal impairments is needed."  (CAR 60.)  However, as in the case

10  of the musculoskeletal complaints, despite a fairly voluminous record, there

11  is scant discussion of plaintiff's treatment record of gastrointestinal

12  complaints.  Rather, there is nothing more than a conclusory finding that

13  "[t]he claimant's gastoresopahgeal reflux disease has not imposed any

14  functional limits and certainly has not mediated any deficiency in nutrition."

15  (CAR 18.)  Despite the Appeals Council order and plaintiff's testimony that

16  she had pain due to her reflux disease and stomach problems, there was no

17  inquiry by the ALJ in this regard; the ALJ failed to fully develop the record.

18  (CAR 517.)   Tonapetyan, 242 F.3d at 1150 (The ALJ has an independent

19  duty to fully and fairly develop the record even where plaintiff is

20  represented.)

21        Inasmuch as the residual functional capacity must be reassessed,[8] and

22

23

24        [8] The ALJ's rejection of plaintiff's complaints rests on the lack of
clinical findings as well as objective findings.  (CAR 18.)  However, as noted

25  herein, the ALJ failed to adequately address the clinical findings as found in
the treatment notes.  Accordingly, the reassessment of plaintiff's residual

26  functional capacity will also require reassessment of plaintiff's credibility in
light of the treatment findings.  Plaintiff will have ample opportunity to

27  present any evidence and to argue how her obesity contributes further to her

28  limitations.

1  a new step four determination must be made, it is not necessary to delve into
2  the merits of plaintiff's step five argument concerning the VE's testimony.
3  Suffice it to say, however, that this testimony is confusing at best and
4  questionable at worst.  (See CAR 533, for example, where VE suggests that
5  plaintiff has transferable skills because she has a GED, and she may be able
6  to learn alternate jobs.)   SSR 82-41.  A vocational expert should again be
7  called.

8        Plaintiff also requests that upon remand, a different ALJ be assigned to
9  hear the third hearing.  (JS, p. 8).  Inasmuch as the Commissioner's own
10 procedure is to assign a different ALJ to a third hearing, the matter is
11 remanded to a different ALJ.  HALLEX I-2-1-55 ("Appeals Council remands
12 . . . are assigned to the same ALJ who issued the decision or dismissal unless:
13 a. the case was previously assigned to that ALJ on a prior remand from the
14 Appeals Council and the ALJ's decision or dismissal after remand is the
15 subject of the new Appeals Council remand.")

16

17                                **ORDER**

18        Accordingly, **IT IS HEREBY ORDERED** that this action is remanded
19 to the Commissioner pursuant to section four of 42 U.S.C. § 405(g).

20        **IT IS FURTHER ORDERED** that the Clerk of the Court serve copies
21 of this order and the Judgment herein on all parties or their counsel.

22

23 DATED:  September 24, 2007

24

25                                    _____/s/_____

26                                    JEFFREY W. JOHNSON
                                     United States Magistrate Judge

27

28

                                    40